UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                                                   DECISION AND ORDER
          v.                                    06-CR-311A

THAMUD ELDRIDGE,
                          Defendant.

## INTRODUCTION

Defendant Thamud Eldridge was charged by indictment with three counts:
(1) unlawful possession of a firearm and ammunition by a person previously
convicted of a felony; (2) possession of cocaine base with the intent to distribute
it; and (3) possession of marijuana.  A jury found the defendant guilty of all three
counts.  After trial, one of the government's key witnesses, a police officer named
Earl Perrin, made statements suggesting that he and another officer had
intentionally assaulted the defendant after arrest.  Those post-trial statements
were contrary to statements that Perrin had made during a police investigation
into the matter.  The government disclosed the statements pursuant to its
obligations under Brady v. Maryland, 373 U.S. 83 (1963), and requested further
guidance from the Court.  The Court directed that the information be disclosed to
the defendant.  Upon disclosure, the defendant moved to vacate his conviction

under Fed. R. Crim. P. 33 asserting that the undisclosed impeachment information warrants a new trial.  The government opposes the motion arguing that a new trial is unwarranted because, at most, the statements show only that Perrin may have committed perjury in another proceeding but do not relate to the substance of his testimony at trial.

For the reasons stated, the Court finds that an evidentiary hearing is necessary to resolve the defendant's motion for a new trial.

## BACKGROUND

**1.   Evidence at Trial**

The charges in this case arose as a result of a police encounter between defendant Eldridge and Buffalo Police Officers Mark White and Earl Perrin on December 7, 2005.  Both officers testified at trial and were key witnesses in the case against the defendant.  Their testimony is summarized as follows.

While on patrol in the City of Buffalo on that date, Officers White and Perrin came upon a parked van with an individual–later identified as defendant Eldridge–standing outside the passenger side of the van leaning in.  It was a cold, snowy night and the officers found it odd that the person would just be standing outside in that weather.  As they approached the van, they observed an object wrapped in a plastic grocery bag being passed to the defendant.  One of the officers, Earl Perrin, testified that he saw the passenger say "oh shit, it's the

police." (See Trial Tr., Dkt. 127, at 63).

At trial, both officers testified that, even though they could not see what was in the bag, they were certain it was a gun based upon their assessment of the weight of the object and the manner in which the defendant was carrying it. After Eldridge saw the officers, he turned and ran.  Officer White testified that the defendant first pointed the object (still wrapped in the bag) at him in a manner that suggested he was pointing a gun.  The defendant then quickly turned and ran, and tucked the object in his pants as he did so.  Officer Perrin remained with the individuals seated in the parked van.

Officer White chased Eldridge in a large circle: west down East Ferry, south on Bissell Avenue, east across yards to Goodyear Avenue, across Goodyear, then north behind a garage on Goodyear and back to East Ferry. While Officer White was chasing the defendant, Officer Perrin initially stayed with the occupants of the van on East Ferry. Officer Perrin radioed for assistance.  He then made several unsuccessful attempts to reach Officer White over the radio but when White failed to respond, Perrin became worried and joined the chase. Unbeknownst to Officer White, his radio was turned off.  The occupants in the van immediately drove away when Officer Perrin joined the chase.

At about that point, Lieutenant Michael McCarthy arrived as back up and joined the chase.  McCarthy and White lost sight of Eldridge.  They then spotted his footprints in the fresh snow and followed them.  The footprints stopped

3

abruptly in front of a deli located on East Ferry Street in Buffalo. Lieutenant McCarthy noticed the defendant lying on the roof of a deli and pointed him out to Officer White. Lieutenant McCarthy had his gun drawn and ordered the defendant to show his hands as Officer White began climbing onto the deli roof. The defendant, who was positioned partially behind a wall on the deli roof looking down at Lieutenant McCarthy, just stared, "smirked" and refused to show his hands. As Officer White climbed up onto the deli's roof, the defendant moved on the roof toward the front of the deli. When Eldridge moved on the roof towards the front of the deli, other officers on East Ferry, including Officer Perrin, saw him. As Officer White made it onto the roof, the defendant ran down the roof and jumped onto the upper-level porch of the home next door, 1135 East Ferry Street. He then dove head first through the closed window of that house. The defendant did not live at 1135 East Ferry Street or have permission to enter.

Officer White continued the chase and jumped from the deli roof onto the porch of 1135 East Ferry in pursuit of the defendant. Lieutenant McCarthy shouted to White to remain outside on the porch until other officers arrived. By that time, as many as 20 officers had converged on the scene. Perrin and many other officers entered the house from the ground floor and tried to gain access to the upper apartment from the hallway while White waited on the porch. From where he stood, White could see the defendant through the window. White testified that the defendant was in a room behind the front room and he was

leaning against an entry way door struggling to keep the door closed.  Officer Perrin and others were on the other side of that door trying to gain access to the apartment.  White also saw the defendant trying to hide something under a curio cabinet.  As he watched, White used a flashlight to break the glass so that he could enter the apartment without getting cut.  At some point, Lieutenant McCarthy joined White on the porch.  White and McCarthy entered the apartment through the broken window just as the other officers successfully broke through the door.

When the officers broke in, part of the door landed on the defendant.  A struggle ensued.  The defendant resisted arrest and the officers had to punch him and hit him in order to get him to place his hands behind his back to arrest him. White admitted punching the defendant during the struggle to gain control of him. As many as eight officers were struggling on the floor trying to get the defendant handcuffed.  This lasted for about 20 to 30 seconds until the defendant was successfully apprehended.

After handcuffing the defendant's hands behind his back, Officers White and Perrin removed the defendant from the apartment and escorted him down the stairs to their police car.  Officer White testified that he and Perrin "walked" the defendant down the stairs and into the car.  (*See* Trial Tr., Dkt. 126, at 157- 58).  Officer White was "holding an arm" and Perrin "was behind" White.  (*Id*.) Many of the other officers remained in the upper apartment.  After placing the

defendant in the police car, White told another officer, Officer Mayhook, where to look for the gun inside the upper apartment.  White and Perrin then took the defendant to the E District police station.

While en route, the officers advised the defendant of his Miranda rights. The defendant falsely identified himself as "Shawn Jones."  Officer White had learned from another officer (Officer Sterlace) that defendant's real name was Thamud Eldridge.[1]  White asked the defendant if that was his name, the defendant denied that it was and continued to claim that he was Shawn Jones. Upon arrival at the E District station, the officers brought the defendant into an interview room, seated him, and showed him a prior mug shot identifying him as Eldridge.  At that point, the defendant dropped his head and looked down.  White then called Lieutenant McCarthy and McCarthy told White to bring the defendant to C District to be interviewed by another officer, Detective Mary Evans, about the shooting.  White testified that he was in E District for about 10 minutes before he was told to bring the defendant to C District.

Upon arrival at C District, Detective Evans told White to uncuff the defendant and put him in a back room.  Before uncuffing him, White searched the defendant and found "a large amount of crack cocaine and some marijuana."  (Id. at 166).  He also found two cigars.  The drugs and cigars were found in the

---

[1]  Eldridge was wanted by the police for questioning in connection with the shooting of another officer.  That information was excluded from trial.

defendant's coat pocket.  White gave the items to another officer and then left C

District with a photographer to photograph the scene where the chase had

occurred earlier that night.

Officer Perrin did not recall whether he was present for that search.  He did

recall that he was alone with defendant Eldridge for about five to ten minutes

while Detective Evans went to get Eldridge something to drink.  While alone with

the defendant, Eldridge volunteered a statement to Perrin to the effect that he

didn't even know what was in the bag.  The van occupants told him "quick, take

this" and he did.  (Id., Dkt. 127, at 93).[2]

At some point, Officer White returned to C District and the two officers

transported the defendant to the Erie County Holding Center ("ECHC").  At

_____

[2]  Eldridge purportedly volunteered additional statements to Perrin but those statements
were excluded at trial.  According to Perrin, the conversations was as follows:

Eldridge: "Why did you have to beat my ass man?"

Perrin: "We didn't beat your ass. We did what we had to to get you."

Eldridge: "If you knew who I was would you have shot me?"

Perrin: "I don't know."

Eldridge: "How did you get to me anyway?"

Perrin: "We were watching a house on Cornwall, but it didn't pan out. Then we
saw the van with you and your boys, and I saw them give you the bag with the
gun."

Eldridge: "Well they just gave me the bag and said 'Quick take this,' I didn't even
know what was in the bag."

Only the last portion of Eldridge's statement was admitted at trial.

ECHC, the defendant was subjected to a strip search and more marijuana was found.

In addition to the testimony of White and Perrin, the government presented other witness, including other officers at the scene. Those officers testified about their observations of the struggle and the recovery of the gun.  The bag that was handed to the defendant was never recovered, only the gun.  However, there was evidence showing that numerous plastic bags similar to the one purportedly containing the gun were found in the apartment that the defendant broke into while trying to escape.

The government also presented forensic evidence.  No fingerprints were recovered on the gun.  However, DNA testing revealed that several individuals had handled the gun.  Eldridge's DNA was not definitively identified as being on the gun, but he also could not be excluded as of the possible contributors of DNA on that gun.


2.   **Brady Evidence**

   A.   **Brady Evidence Known Before Trial**

Before trial, the government had moved in limine to preclude disclosure of certain potential Brady information relating to Officer Perrin.  Specifically, the government had information concerning three internal Buffalo Police Department (BPD) investigations conducted wherein charges against Officer Perrin were

sustained.  One investigation related to an incident that occurred on May 30, 2002.  Officer Perrin was alleged to have used excessive force against two citizens and failed to file a "Use of Force" report as required by departmental regulations.  A hearing was held and Officer Perrin pleaded guilty to failing to file the Use of Force report.  The remaining charges were dismissed.

The second investigation related to an incident that occurred in April 2002 wherein Officer Perrin was again alleged to have used excessive force and failed to fail the appropriate Use of Force report.  Officer Perrin again pleaded guilty to failing to file the appropriate Use of Force report, was assessed a one-day suspension, and the remaining charges were dismissed.

The third investigation related to an incident that occurred years after Eldridge was arrested but before trial.  In that incident, Officer Perrin was alleged to have used physical force in March 2007 by striking a handcuffed citizen.  He was also charged with being untruthful in his Professional Standards Division statement about that incident and with failing to file a Use of Force report.  Following a hearing, Officer Perrin pled guilty to failing to file the Use of Force report, was assessed a one-day suspension and all of the remaining charges (including the charge of untruthfulness) were dismissed.

In addition to those investigations, the government advised the Court that defendant Eldridge had filed an administrative complaint against Officer Perrin nearly three years after the 2005 arrest, alleging that Officer Perrin had used

excessive force in connection with that arrest.  An investigation was conducted and Officer Perrin admitted using force to the extent necessary to apprehend Eldridge, but denied using force after Eldridge was arrested.  Those charges were dismissed.

The Court denied the government's request to issue a protective order protecting the disclosure of the internal investigations.  Instead, the Court directed the government to turn over the information to defense counsel so that counsel could determine if and how he intended to use the materials at trial.  During trial, defense counsel sought to impeach Perrin using evidence of his  alleged history of using excessive force as well has his history of failing to file use of force reports.  The Court precluded reference to the prior excessive force charges as irrelevant but permitted Perrin to be cross-examined relating to his failure to file required police reports. On cross-examination, defense counsel asked Officer Perrin if he had ever failed to file a required report and he admitted that he had. (See Tr. of Trial, Dkt. 127, at 122).  That was the end of the inquiry.  There was no reference to the potential use of excessive force during defendant Eldridge's arrest.  On the contrary, the testimony at trial by Perrin and others indicated that the used force during Eldridge's arrest was only as much as was necessary to apprehend him because he resisted.

## 2.    **Post-Trial Brady Material**

After Eldridge was convicted and sentenced, the prosecuting Assistant

United States Attorney (AUSA) overheard Perrin tell others that he and White had

intentionally assaulted Eldridge after the arrest.  Specifically, while in a bar with

the AUSA who prosecuted defendant Eldridge, Officer Perrin–after consuming

several alcoholic beverages– told another person at the bar (in the AUSA's

presence) that he and "Whitey" (referring to Officer White) took defendant

Eldridge "down the stairs head first, like dadadadada . . . ."  Perrin further stated

that Eldridge initially told the officers that his name was Shawn Jones, but when

they learned that he was wanted for shooting another cop, "we knocked him out,

like boom."  Perrin also claimed that "Whitey was stomping on him," that Perrin

had to stop him, and that afterward, Perrin "had to mop up the blood."

On or about October 26, 2010, the government advised the Court of

Perrin's post-trial statements at the bar.  In doing so, the government advised the

Court that Perrin's post-trial statements:

> were contradictory to the testimony given by both Officer Perrin and
> Office White during the internal investigation conducted by the
> [Buffalo Police Department], were never disclosed to [the AUSA]
> during trial preparation, despite several inquiries by [the AUSA]
> regarding Eldridge's allegations that Officers Perrin and White
> punched and kicked him repeatedly while at the BPD E-District
> station house on December 7, 2005.  Further, such statements could
> cast doubt on the veracity of BPD reports filed by Officers Perrin and
> White documenting the events of December 7, 2005.  Although the

11

statements are not directly contrary to the trial testimony of either
Officer Perrin or Officer White, the government's knowledge that
either witness may have rendered false testimony in connection with
an internal disciplinary proceeding, was not candid with the trial
AUSA, or filed false or incomplete reports certainly would be relevant
to the government's constitutional obligations under Brady v.
Maryland, 373 U.S. 83 (1963).

(See Aff. of AUSA Karaszewski, Dkt. 132, at ¶ 5).

The Court ordered that the information remain under seal for a short period

of time,[3] after which the government was directed to disclose the information to

Eldridge's defense attorney.  The government did so and on January 5, 2011,

Eldridge moved for a new trial in light of the Perrin post-trial statements.  In his

motion, Eldridge notes that the newly-disclosed information impacts testimony

that occurred at Eldridge's suppression hearing, and also impacts the

impeachment of Officers Perrin and White at trial.  Eldridge seeks to vacate his

conviction so that he can revisit the suppression issue and, if necessary, impeach

Perrin at a subsequent trial.

The government opposes the defendant's motion for a new trial arguing

that the new evidence of potential perjury does not undermine the verdict.

Although the government admits that Perrin's statements "would probably have

_____

[3] The Court was advised that the Department of Justice was conducting a civil rights
investigation into the matter.  The Court permitted the matter to remain under seal for a short
period of time so as to provide DOJ with the opportunity to complete its investigation.
Eldridge's conviction in this case was on appeal to the Second Circuit and Eldridge had also
been indicted on additional unrelated charges.  Those additional charges made it unlikely that
Eldridge would be released on bail pending resolution of the matter.  Accordingly, the Court
found no prejudice to Eldridge in permitting the information to remain under seal while awaiting
completion of the DOJ investigation.

been proper grist for cross-examination," (see Dkt. 145, at 8), a new trial is

unwarranted because Eldridge cannot show that the admission of that evidence

probably would have led to an acquittal.

## DISCUSSION

Motions for a new trial pursuant to Rule 33 are disfavored and granted only with

great caution, and only in the most "extraordinary circumstances." United States v.

Wong, 78 F.3d 73, 79 (2d Cir.1996); United States v. Sasso, 59 F.3d 341, 349 (2d Cir.

1995). "Such relief should be granted only if the evidence is material to the verdict,

could not with due diligence have been discovered before or during trial, and is not

cumulative." Sasso, 59 F.3d at 349.

Eldridge asserts that a new trial is warranted under Rule 33 because Perrin's

post-trial statements constitute undisclosed impeachment material in violation of Brady

v. Maryland, 373 U.S. 83 (1963). He seeks a new trial so that he can impeach Perrin

with his own statements indicating that he and White assaulted him after arrest and

later lied about it to BPD investigators and the AUSA prosecuting the case.

Where a Rule 33 motion alleges new evidence of perjury, there must be a

threshold determination as to whether the witness actually committed perjury. United

States v. Stewart, 433 F.3d 273, 297 (2d Cir. 2006); United States v. White, 972 F.2d

16, 20 (2d Cir. 1992). Once that threshold determination is made and the Court is

satisfied that new evidence demonstrates perjury by a witness, the Court must then

determine whether the perjury was material to the jury's verdict and whether the

13

prosecution was aware of the perjury. Id. at 81.

There has not yet been any threshold determination into whether Officer Perrin actually committed perjury when he denied assaulting Eldridge post-arrest.  The government takes no position on the veracity of those statements.  At this juncture, it is unknown whether Perrin and White actually assaulted Eldridge post-arrest and later lied about it,[4] or whether Perrin's post-arrest statements can be attributed to a grandiose exaggeration of the events that night.  This Court cannot properly evaluate the merits of Eldridge's Rule 33 motion until that threshold determination is made.

The government urges the Court to deny the motion asserting that the new impeachment evidence, even if true, fails to warrant a new trial.  The government claims that there is no indication that Perrin committed perjury at trial and, at most, the new statements suggest only that Perrin may have committed perjury during a BPD investigation.  While conceding that those statements were Brady material and would have been "proper grist" for cross-examination had they been made before trial, (see Dkt. 145, at 8), the government argues that they are not relevant to the testimony that Perrin gave at trial.  The statements relate to incidents alleged to have occurred *after* Eldridge was arrested, whereas Perrin's trial testimony focused primarily on the events occurring *before* the arrest.  Moreover, the government points out that if those events did indeed happen, Eldridge knew of them and could have exploited them during Perrin's cross-examination but simply chose not to.

---

[4]  The Court has not been provided with White's testimony from the BPD investigation. Presumably, White was also questioned by BPD investigators and the AUSA and denied assaulting Eldridge post-arrest.  If the assault actually happened and White denied that it did, that would mean that White also provided false testimony to the BPD.

It is not entirely clear at this juncture that no trial perjury occurred.  For example, White testified at trial that he and Perrin "walked" Eldridge down the stairs, but in Perrin's post-trail statements indicate that they took Eldridge down the stairs "head first."  Perrin and White also testified extensively about the events occurring after Eldridge was taken into custody and brought first to E District and then to C District, including the discovery of additional drugs and inculpatory statements made by Eldridge.  However, neither officer mentioned any post-arrest assault.  If the assault occurred as described, some of that testimony was either untruthful or contained material omissions.  Moreover, if Eldridge was assaulted before his inculpatory statements were made, this Court's earlier suppression rulings would need to be revisited.

The government asks this Court to assume that everything Perrin and White testified to at trial was credible.  If it turns out that Perrin (and perhaps also White) assaulted the defendant and then lied to authorities about it, that would have had a significant impact upon their credibility at trial.  The government has conceded that Perrin and White provided testimony that was essential to Eldridge's conviction.  The government has also conceded that evidence of Perrin's alleged perjury would have been admissible to impeach Perrin's credibility.  "[W]hen the reliability of a particular witness may be determinative of innocence or guilt, a 'new trial is required if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .'"  United States v. Seijo, 514 F.2d 1357, 1364 (2d Cir. 1975).  Vigorous cross-examination may have convinced a jury not to believe other portions of Perrin's (and White's) testimony.  Defense counsel likely would have argued to a jury that if Perrin and White were willing to assault the defendant and then lie about it because they believed

15

him responsible for shooting another officer, wouldn't they also have been willing to lie at trial to ensure his conviction?

On the other hand, if it turns out there was no assault and Perrin's statements simply reflect an alcohol-induced false claim of bravado made in a misplaced attempt to impress old friends, the credibility of other portions of Perrin's testimony would not be undermined.  Nor would there be any reason to question White's credibility.

In sum, the motion for a new trial cannot be resolved until a threshold determination has been made into whether Perrin and White actually assaulted the defendant after his arrest, and if so, whether one or both of those officers then lied about it.  Once that threshold determination is made, the Court can then address the impact of the perjury (if any) on the defendant's conviction.


## CONCLUSION

For the reasons stated, the Court finds that an evidentiary hearing is necessary to resolve Eldridge's motion for a new trial.  The hearing will focus on the veracity of the post-arrest statements made by Perrin.  The parties shall appear in Court on Tuesday, August 23, 2011, at 9:00 a.m. for a meeting to set a date for the evidentiary hearing.

SO ORDERED.


*s/ Richard J. Arcara*
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT JUDGE


DATED: August 12, 2011

16