UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                              Plaintiff,

         v.                                      DECISION AND ORDER
                                                 06-CR–311

THAMUD ELDRIDGE,

                              Defendant.

## *Introduction*

Defendant Thamud Eldridge ("Defendant") has moved for a new trial

pursuant to Rule 33 of the Federal Rules of Criminal Procedure. Defendant

Eldridge's Rule 33 motion is based upon statements made, in 2010, by Buffalo

Police Department ("BPD") Officer Earl Perrin, who was a Government witness

during Defendant's trial in 2009, in the presence of Assistant United States

Attorney ("AUSA") Joseph M. Tripi, who had tried the case against Defendant.

The statements, if credible, seem to indicate that Officer Perrin and BPD Officer

Mark White, who also testified at Defendant's trial, had used excessive force

during Defendant's arrest and later made false statements regarding their use of

force during both the trial and a suppression hearing conducted by Magistrate

Judge Jeremiah J. McCarthy.

As explained in detail below, the Court finds that Officer Perrin's

statements from July 2010 were not an accurate or honest description of the Defendant's arrest, and that there is insufficient evidence in the record to conclude that the Officers used excessive force during or after Defendant's arrest. Furthermore, the Court concludes that even if Perrin's statements could have been used to impeach Perrin and Officer White either at trial or during the suppression hearing, the remaining proof at the time of the trial is sufficient to sustain Defendant's conviction on all counts. Therefore, Defendant's motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure is denied in its entirety.

## ***Background***

On May 4, 2009, following a jury trial, Defendant was convicted of being a previously convicted felon in possession of a firearm in violation of Sections 922(g)(1) and 924(a)(2) of Title 18 of the United States Code, possession of cocaine base with intent to distribute in violation of Section 841(a)(1) of Title 21 of the United States Code, and possession of marijuana in violation of Section 844(a) of the United States Code. Defendant was sentenced by this Court on August 28, 2009.

Almost one year later, in July 2010, the Government disclosed to this Court, *ex parte*, that Perrin made statements in the presence of AUSA Tripi which implied that Perrin and White had used excessive force during and after Defendant's arrest. This Court then ordered the Government to disclose Perrin's

statements to Defendant. On January 4, 2011, Defendant made a motion for a new trial arguing that Perrin's statements, if known at the time, would have had a substantive impact on the outcome of the suppression hearing and could have been used to impeach Perrin's credibility during the trial.[1]

On August 12, 2011, this Court issued a Decision and Order concluding that an evidentiary hearing would be necessary to resolve Defendant's Rule 33 motion. Specifically, this Court found that a hearing was needed to determine whether Perrin and White "actually assaulted the defendant after his arrest, and if so, whether one or both of those officers then lied about it." This Court conducted an evidentiary hearing on October 11, 2011 and October 18, 2011. The parties then provided post hearing submissions and an oral argument was held on June 12, 2012.

### *Facts*

After carefully observing the witnesses' demeanor and testimony, the Court finds the following facts.

### *Defendant's Arrest*

During the October 2011 evidentiary hearing, Officer Perrin testified that he

---

[1]Defendant concedes that the use of Perrin's statements at trial would not have had an impact upon Defendant's conviction for possession of marijuana in violation of Section 841(a)(1) of Title 21. Thus, Defendant is only seeking a new trial with respect to his convictions for being a previously convicted felon in possession of a firearm (18 USC §§ 922(g)(1) and 924(a)(2)) and possession of cocaine base with intent to distribute (21 USC §841(a)(1)).

and Officer White were among a group of BPD officers involved in the arrest of Defendant on December 7, 2005.  Defendant, in an attempt to flee from arresting officers, dove through a closed, glass window of an apartment building located at 1135 East Ferry Street, Buffalo, New York.  The officers proceeded to knock down a door in order to enter the residence and apprehend Defendant.

Perrin further testified that, after knocking down the door, a fight ensued between Defendant and the officers, and it was necessary for Perrin and others to punch Defendant about the head and body in order to handcuff him.  Perrin testified that Defendant walked down the stairs on his own, with the officers escorting him from behind.  He denied dragging Defendant down the stairs or bringing him down the stairs head first.

Perrin further testified that following the arrest, they brought Defendant to the District E police station located at 2767 Bailey Avenue in Buffalo, New York. Perrin testified that it was there that they learned Defendant's identity, and that he had previously been accused of shooting at a Buffalo police officer.  Perrin testified that Defendant remained in handcuffs while they were in the District E garage, and that no force was used against him during that time.  Defendant was then taken to the District C police station for further questioning.

Perrin's account of the arrest was consistent with the testimony provided by

White during Defendant's trial.[2]

<em>Project Safe Neighborhoods Conference</em>

In July 2010, over a year after Defendant's trial and conviction, AUSA Tripi and Officer Perrin attended a Project Safe Neighborhoods conference in New Orleans, Louisiana. Due to weather problems, Tripi and Perrin missed their connecting flight from Atlanta to New Orleans. While waiting to see if they could board a later flight to Atlanta that evening, Tripi and Perrin had dinner together at the Atlanta airport. Both Perrin and Tripi consumed an alcoholic drink with dinner. The remaining flights to New Orleans were then cancelled, and Tripi booked a hotel room for himself and Perrin in Atlanta that evening.

Tripi testified that upon arriving at the hotel, he registered himself and Perrin and took his luggage to the room, while Perrin went to the hotel bar. Tripi then went back downstairs and met Perrin at the bar. Tripi testified that Perrin was already drinking when Tripi arrived. He believed Perrin was drinking a "Long Island Iced Tea" at that time, since Perrin later asked the waitress for "another" Long Island Iced Tea. Long Island Iced Teas are extremely strong alcoholic

---

[2] Prior to trial, Defendant made a motion to suppress, among other things, the statements he made while in custody following his arrest. Defendant argued, in part, that the officers used "excessive and unnecessary force" in subduing him and therefore any statements he made were involuntary. After conducting a suppression hearing on May 24, 2007, Magistrate Judge McCarthy determined that the force used under the circumstances was not excessive and that the statements were admissible. This Court then adopted Judge McCarthy's recommendation regarding the admissibility of the statements.

beverages.  During the hearing, the Court asked Officer Perrin to describe what

he was drinking in the bar that evening:

> The Court: What were you drinking? ...
> Perrin: I was drinking Long Island iced teas...
> The Court: What's that?
> Perrin: About six liquors in one drink, six different liquors in one drink.
> The Court: Six shots of liquor?
> Perrin: Yeah, its like vodka, some whiskeys.  I don't know how many – what the different ones are, but six...
> The Court: How many of those did you have?
> Perrin: At least five, I know that.  I was – well, at least five.
> The Court: Were you drunk?
> Perrin: Yes sir, to say the least.

*See* Transcript of Evidentiary Hearing, Volume 1, pg. 26-27, Dkt. 151.

Tripi further testified that Mr. Rodney Cadele and his adult son later arrived

at the bar to meet Perrin.  Perrin explained to Tripi that he and Cadele were close

friends and that they had played high school and college football and had run

track together.  Tripi testified that Perrin and Cadele began boasting about their

physical abilities as well as engaging in banter about who was a better athlete.

Tripi testified that at some point the conversation turned to Perrin's job and

specifically the case involving the Defendant.    At that time, Perrin began

discussing various facts of the case with Cadele and his son, including the chase

of Defendant and the arrest.  Tripi testified that he heard Perrin make statements

that may have been inconsistent with testimony provided by Perrin at the

suppression hearing and trial.

Specifically, Perrin told Cadele and his son that after arresting Defendant at the East Ferry apartment, he and Officer White "took [the Defendant] down the stairs head first like da, da, da, da, da." Tripi also testified that he heard Perrin tell Cadele with respect to the arrest, "we knocked him out like boom" and "I had to stop [White] because we don't want a murder. I've had that before." Tripi testified that Perrin told Tripi to cover his ears, at which point Tripi heard Perrin whisper to Cadele and his son, "I had to mop up the blood."

Tripi testified that the following morning they proceeded to the conference in New Orleans, and that he and Perrin had no further conversations about the Defendant's case for the rest of the trip. Tripi testified that when he returned from the conference, he reported the conversation in the hotel bar to his supervisors.

Perrin's testimony corroborated that he attended a Project Safe Neighborhoods Conference with Tripi and other members of the United States Attorney's Office in July 2010. Perrin confirmed that he and Tripi had to stay overnight in a hotel in Atlanta when their flight was canceled due to rain. Perrin also testified that he remembered going to the hotel bar with Tripi, and meeting his childhood friend, Cadele, and Cadele's son.

Perrin testified that during his time in the hotel bar, and while he was talking to Cadele and his son, he was extremely intoxicated. Perrin testified that he drank at least five Long Island Iced Teas. Perrin also testified that he had no recollection of making any of the statements referenced by Tripi with respect to

Defendant's arrest. [3]

Tripi's testimony corroborates that Perrin was impaired at the time of his conversation with Cadele and his son. Tripi testified that he did not know exactly how many drinks Perrin consumed that evening, but that he had witnessed Perrin consume at least three alcoholic drinks in his presence, including at least two Long Island Iced Teas. Tripi also testified that Perrin appeared impaired.

Importantly, at the conclusion of Tripi's testimony, the Court asked Tripi whether, based upon his perception that evening, Perrin appeared to be boasting or bragging in some way about the arrest of the Defendant. The Court further asked Tripi if Perrin's statements appeared credible. In response, Tripi indicated that he believed Perrin was embellishing the circumstances of Defendant's arrest in order to impress Cadele and his son. Tripi stated:

> My impression was that he was I guess bragging about what he was able to do in his job or – and that's how the story got started. I felt like he was embellishing or bragging, if you want an opinion on it. I felt like Rod and him were boasting back and forth, like old friends razzing each other in a way. So when he was telling the story about this case, if you are asking me my opinion, I felt like he was puffing some of it up, but that's – I mean, he said what he said. So that was just my impression of it.

---

[3]After testifying that he did not remember making the statements regarding Defendant's arrest to Cadele and his son, Perrin was again questioned about the actual circumstances of Defendant's arrest. Consistent with his prior testimony, Perrin testified that on December 7, 2005, the night of Defendant's arrest, he did not drag or push Defendant down the stairs, and that the Defendant walked down the stairs unassisted. Perrin also testified that Defendant was not assaulted at the E District station after being taken into custody.

*See* Transcript of Evidentiary Hearing, Volume 2, pg. 23-24, Dkt. 152.

Further, Tripi testified that some of the statements made by Perrin to Cadele regarding Defendant's arrest were inconsistent with the statements made by the Defendant at the Professional Standards Division Hearing [4] :

> Some of it was consistent and some of it was inconsistent. For example, [the Defendant] in the Professional Standards Division statement said he didn't get thrown down any stairs. They tried and he braced himself. That was [the Defendant's] statement. Officer Perrin says we threw him down the stairs like da, da, da, da, da....
>
> Knowing [Defendant's] proclivity for writing letters and lodging complaints, when Mr. Perrin said he threw him down the stairs, I didn't believe that was true. I thought he was bragging because, rest assured, if [Defendant] had been thrown down the stairs, my opinion was that he would have complained about that to ...
>
> However, when Officer Perrin said we hit him, that was a complaint that [the Defendant] had made. So I –I'm sorting through the statements that Perrin's making, and some of them seem like he was full out bragging and making himself seem like a tougher guy to his friend, and others had some ring of truth to me because of the things that [the Defendant] had complained of, if I can explain it like that.

*See* Transcript of Evidentiary Hearing, Volume 2, pg. 25-26, Dkt. 152.

---

[4]Defendant filed a complaint with the Buffalo Police Department on May 29, 2008, alleging that Perrin and others used excessive force during and after Defendant's arrest on December 7, 2005. BPD conducted a Professional Standards Division hearing during which both Perrin and Defendant provided statements.

### *Discussion*

Motions for a new trial are disfavored by the Second Circuit.  *United States v. Rahman*, 1998 U.S. App. LEXIS 31789 (1998); *United States v. DiPaolo*, 835 F.2d 46, 49 (2d Cir. 1987) (a district court should grant a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 "with great caution" and "only in the most extraordinary of circumstances").  Indeed, Rule 33 motions are to be granted only in circumstances where the new evidence, if believed, could change the verdict. *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995).

Significantly, new evidence which merely discredits a government witness and does not directly contradict the government's case ordinarily does not justify a new trial.  *Romero v. United States*, 28 F.3d 267 (2d Cir. 1994) (motion for a new trial unsuccessful because even assuming each of the agents could be thoroughly impeached by the newly discovered evidence of improper conduct, the remaining proof was sufficient to sustain the conviction of defendant on all charges). Evidence of impeachment is material, and may justify a new trial, if the witness whose testimony is attacked supplied the only evidence linking the defendant to the crime, or "where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case."  *United States v. Wong*, 78 F.3d 73 (2d Cir. 1995).

Here, Defendant maintains that Officer Perrin's statements at the hotel bar in Atlanta indicate that Perrin and Officer White lied regarding the use of excessive

force at the suppression hearing before Magistrate Judge McCarthy and during a

BPD Professional Standards Division hearing. Defendant further contends that

those statements could have been used as support for suppressing Defendant's

statements at the time of his arrest and to impeach the Officers' testimony at trial,

which likely would have affected the outcome of the case.

After observing the testimony and demeanor of the witnesses at the

evidentiary hearing in October 2011, as well as studying the record of this case in

its entirety, the Court finds that Perrin's statements at the Atlanta hotel bar were

not an honest or accurate description of Defendant's arrest but instead

embellishments and exaggerations made up by Perrin to impress a childhood

friend. The Court also finds that there is insufficient evidence in the record to

indicate that the Officers assaulted Defendant during or after his arrest and then

lied about it. Furthermore, assuming that Perrin's statements did tend to show that

excessive force was used and had been admitted at the suppression hearing or at

trial, the Court finds that a new trial is not warranted since the remaining proof is

sufficient to sustain Defendant's conviction on all counts.

### *Officer Perrin's Statements in Atlanta Do Not Show that Excessive Force Was Used Against the Defendant*

The Court credits AUSA Tripi's testimony at the October 2011 evidentiary

hearing that Perrin made the following statements at the hotel bar in Atlanta: (1)

that at the time of Defendant's arrest in 2005 he and Officer White took the

Defendant "down the stairs head first like da, da, da, da, da"; (2) that they "knocked [Defendant] out like boom"; (3) that he "had to stop [White] because we don't want a murder"; and (4) that he "had to mop up the blood". However, the Court finds these statements to be unreliable since, at the time they were made, Perrin was at a bar, heavily intoxicated and engaged in juvenile banter and bragging with a high school and college sports friend and his adult son. Furthermore, the statements are contradictory to the credible evidence and testimony in the record.

Testimony from the October 2011 evidentiary hearing indicates that after consuming a number of strong alcoholic drinks, Perrin was bragging to Cadele, his son and Tripi about his physical ability and aptitude at sports. It appears that Perrin was then attempting to further impress or entertain his childhood friend with exaggerated stories about his job as a police officer including his arrest of the Defendant. The Court credits Tripi's testimony that, according to his perception of the conversation, Perrin was embellishing or bragging about the circumstances of Defendant's arrest in order to impress or entertain Cadele and his son.

During the evidentiary hearing Perrin described how, on the night of Defendant's arrest, Defendant fled from officers and dove head first through a glass window. Perrin testified that he and others had to punch Defendant about the head and body in order to take him into custody; and that once in custody, Defendant walked down the stairs of his own volition and was not subject to any further force. Perrin's testimony about Defendant's arrest was largely consistent

with the prior testimony taken at the suppression hearing before Magistrate Judge McCarthy, the statements given at the Professional Standards Division hearing and the testimony from Defendant's trial. Thus, the Court credits Perrin's testimony, which was taken under oath and is bolstered by other independent testimony in the record about the events in question, over statements he made at a hotel bar, after consuming numerous Long Island Iced Teas and while trying to impress and entertain a childhood friend and former teammate.

The Court recognizes that Tripi credibly testified that he believed that some of Perrin's statements had a "ring of truth" because they were consistent with complaints made by Defendant in the Professional Standards Division hearing, such as when Defendant claims that Perrin hit him. However, it took Defendant nearly three years to file a formal complaint alleging that the force used against him was excessive and that he was subject to an assault after he had been handcuffed and taken to E District police station. Moreover, Defendant's story has changed over time in an apparent effort to conform with Perrin's statements at the Atlanta bar.

In Defendant's motion for a new trial, he claims he was dragged or thrown down the stairs in the manner described by Perrin at the hotel bar in July 2010. However, during the Professional Standards Division hearing in 2008, Defendant stated the following:

One officer said, "[p]ush him down the stairs" [b]ut I braced myself

> against the wall, so I didn't go down the stairs.  They tried to push me down the stairs, so I braced myself against the wall, so they [unclear] me down the stairs.[5]

*See* Transcript of Professional Standards Division Hearing, pg. 6, Dkt. 145.

Defendant maintains that he must have used the word "dragged" or something similar to describe the manner in which he went down the stairs.  However, when the Defendant's statements from the hearing are considered in their entirety, it is most likely that the Defendant never stated that he was pushed or thrown down the stairs.  Specifically, at another point during the hearing, Defendant states again that the officers "*tried* to push [him] down the stairs" (emphasis added).  The detective conducting the hearing later attempts to clarify what happened on the stairs:

> [A]fter they get you handcuffed and then they finally get you to the police car, you weren't thrown down the stairs...you thought they were going to but you...

*See* Transcript of Professional Standards Division Hearing, pg. 15, Dkt. 151.

The defendant then provides an unclear response to the detective's statements.

The detective replies:

> they tried to but you...they were unsuccessful...they get you into a police car...whose did you go into...Perrin's?

*See* Transcript of Professional Standards Division Hearing, pg. 15, Dkt. 151.

Defendant then answers, "Perrin's and White's", and says nothing more regarding

------

[5]The BPD Professional Standards Division hearing was audiotaped, and the transcript reflects that certain portions of the tape were inaudible.

the stairs.

At no time during the hearing does Defendant expressly state that he was dragged or thrown down the stairs.  Instead, he states repeatedly that the officers "tried" to push him down the stairs.  Moreover, when the detective indicates, based upon Defendant's statements, that the officers tried to push the Defendant down the stairs but were unsuccessful, Defendant does not correct the detective or clarify his answer.  Indeed, had the Defendant been taken "head first down the stairs like da, da, da, da, da" as Perrin stated in the Atlanta bar, it defies logic that Defendant, in a hearing regarding his excessive force complaint, would not clearly and emphatically state that he had been dragged or thrown down the stairs.

Additionally, during the Professional Standards Division hearing Defendant alleges that he was assaulted at E District station *after* he was subject to a lengthy interview at the C District station.  However, in March 2011, after the Government disclosed Perrin's July 2010 statements to Defendant, Defendant made a motion to disqualify Tripi from another case against Defendant (*United States v. Eldridge*, 09-CR-329-A), on the grounds that Tripi was a potential witness.  In the March 2011 motion, Defendant claimed, for the very first time, that he was beaten by Officer White and others *before* he was interviewed at C District station.  Indeed, it is curious that Defendant's March 2011 new version of events is much more consistent with Perrin's July 2010 statements in the Atlanta bar.  Moreover, during the Professional Standards Division hearing, Defendant stated that he was not

knocked unconscious.  However, in the March 2011 motion, filed after Perrin's July 2010 statement that the officers "knocked [Defendant] out like boom", Defendant alleges that he was knocked unconscious.  The ever-changing nature of Defendant's complaints indicates to this Court that there has been a clear attempt on the part of the Defendant to change or tailor his story based upon Perrin's statements at the Atlanta bar.

Furthermore, documentary evidence taken during the hearing demonstrates that Defendant was not assaulted in the manner he claims, and illustrates that Perrin's July 2010 statements regarding the arrest are not an accurate or honest description of what actually occurred.  A booking photograph taken of Defendant at the Buffalo holding center the morning after his arrest shows Defendant's only visible injury to be slight swelling to his right eye.  Further, the medical intake form from the Buffalo holding center, signed by Defendant at the time of his arrest, reflects only that Defendant had a "scrape on the head" and that he refused medical treatment.  The photograph and medical intake form reveal that Defendant's injuries were minor and consistent with the prior, undisputed testimony that he dove through a glass window and had to be subdued by the officers.

Indeed, the fact that Defendant had only slight swelling in his right eye is directly contradictory to his claim that Officer White punched him in the left eye at E District after he had been taken into custody.  Finally, if Defendant had been thrown or dragged down stairs head first, punched in the left eye, kicked, knocked

16

unconscious and expelled enough blood that Perrin had to "mop it up", the photographs most likely would have depicted much more severe injuries and it is probable that Defendant would have been in need of medical attention. It is also significant that during the Professional Standards Division hearing Defendant stated that he was not in pain and did not have a hard time walking following the arrest.

In sum, the credible evidence and testimony taken by this Court at the October 2011 evidentiary hearing, considered together with the record of the case in its entirety, indicates that Perrin's statements at the Atlanta bar in July 2010 are not an accurate or honest representation of the circumstances of Defendant's arrest. Moreover, there is insufficient evidence to conclude that Perrin or White used excessive force or assaulted Defendant, or that the Officers lied during a suppression hearing conducted by Magistrate Judge McCarthy.

### *The Remaining Proof at Trial is Sufficient to Sustain Defendant's Conviction*

Assuming that Officer Perrin's statements were to have been introduced at the suppression hearing or during the trial, this Court finds that a new trial still would not be warranted. Defendant contends that the statements, if known at the time, would have substantively impacted the suppression hearing in that Magistrate Judge McCarthy may have concluded that any statements by Defendant with respect to the gun were involuntary as a result of the Officers' use of excessive force. Further, Defendant argues that Perrin's statements would have been proper

impeachment material at trial. However, Defendant's statements at the time of his arrest and Perrin and White's testimony did not provide the only proof at trial with respect to Defendant's conviction for being a previously convicted felon in possession of a firearm.

BPD Officer James Hosking, who was also involved in the pursuit of Defendant on December 7, 2005, testified that he observed Defendant holding his hand to his right side while running away from the officers. Hosking was approximately ten to twelve feet from the Defendant at the time. He testified that based upon his training and experience, he concluded that Defendant was carrying a gun. Indeed, Hosking testified that he made a contemporaneous radio transmission alerting other officers to the direction of Defendant's flight and stating that "[Defendant] was holding his right side like he's got a pistol."

Further, BPD Officer Jason Mayhook testified that he found and secured the firearm in the apartment where Defendant was apprehended. A forensic serologist testified that she conducted a comparison between Defendant's DNA and the DNA that had been recovered from a swab of the firearm. Based upon this comparison she concluded that Defendant was a possible contributor to the mixture of DNA found on the gun. She specifically testified that the probability of selecting a random, unrelated individual as a possible contributor to the DNA found on the gun was at least one in 823 for a U.S. individual. Thus, the Court concludes that even if Defendant's statements had been suppressed and Officer Perrin's statements

had been introduced at either the suppression hearing or at trial for impeachment purposes, there was sufficient independent evidence indicating that Defendant possessed the recovered firearm to sustain his conviction pursuant to Sections 922(g)(1) and 924(a)(2) of Title 18 of the United States Code. *See Sanders v. Sullivan*, 863 F.2d 218, 226 (2d Cir. 1988) (a new trial should only be granted if the Court believes that "but for the perjured testimony, the defendant would most likely not have been convicted").

Defendant further argues that Perrin's statements, if introduced at trial, would have undermined Perrin's and White's credibility about Defendant's demeanor after the arrest. White and Perrin both testified that, at the time of his arrest, Defendant appeared "very calm" and not high or intoxicated. Defendant argues that this testimony was heavily relied upon by the Government to show that Defendant was a dealer, rather than a user, of crack cocaine.

The Court finds Defendant's argument to be without merit. Notwithstanding Perrin's and White's testimony regarding Defendant's demeanor, there was ample evidence in the record to support the jury's conviction with respect to the distribution charge. Officer Mayhook testified that he was present when 2.5 grams of crack cocaine were recovered from Defendant's possession. The crack cocaine was in the form of one large rock. Officer William Donovan, a detective in the Buffalo Police Department narcotics unit, was qualified by the Government as an expert in street level narcotics trafficking. Donovan testified that over the course of

his career he has conducted extensive and numerous investigations regarding the distribution of crack cocaine including how it is made, priced, and sold. Donovan testified that he has been involved in over a thousand arrests and investigations regarding crack cocaine and marijuana and that he has conducted over a thousand interviews with individuals involved in the distribution of crack cocaine.

Donovan further testified that, based upon his experience and training, a typical dose of crack cocaine is two to three "dime" bags. One dime bag contains .1 grams of crack cocaine and has a typical street level value of $10.00. Donovan testified that crack cocaine is highly addictive and that most users will consume the crack cocaine immediately after purchasing it. As a result, users typically do not carry large amounts of the drug. Donovan testified that the vast majority of his arrests of crack cocaine users involve the possession of two or three dime bags at most. Donovan also testified that, based upon his training and experience, many drug dealers carry large rocks of crack cocaine and break it off into little pieces to sell, rather than carry individual dime bags, in an attempt to thwart law enforcement efforts to prove an intent to distribute.

Here, Defendant was carrying a large rock containing approximately 2.5 grams of crack cocaine. According to Donovan's testimony, this is the equivalent of approximately 25 dime bags and has a street level value of between $250 and $300. Donovan testified that 2.5 grams is consistent with a dealer amount of crack cocaine. The Court concludes that based upon the amount of drugs possessed by

Defendant, the manner in which he possessed them, his possession of a firearm and his flight from police, there was sufficient evidence to sustain his conviction pursuant to Section 841(a)(1) of Title 21 of the United States Code.

### *Conclusion*

For these reasons, the Court denies Defendant Thamud Eldridge's motion for a new trial pursuant to Rule 33 of the Federal Rule of Criminal Procedure in its entirety.


SO ORDERED.


*s/ Richard J. Arcara*

HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT JUDGE

DATED:October 5, 2012